**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **ROBERT J. STOUT, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.: <u>3:09-cv-00285-DRH-PMF</u>** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>REPORT AND RECOMMENDATION</u>

**FRAZIER, Magistrate Judge:**

This matter has been referred to United States Magistrate Judge Philip M. Frazier from United States District Judge David R. Herndon pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and SDIL-LR 72.1(a) for a Report and Recommendation. Plaintiff Robert J. Stout, Jr. ("Stout") seeks judicial review of the final decision of the Social Security Administration ("SSA") denying his application for disability and disability insurance benefits filed on or about October 12, 2006. Stout's application was denied by Administrative Law Judge ("ALJ") Kathleen Thomas when she rendered a decision finding that Stout was not disabled (Tr. 11-21). That decision became final when the Appeals Council declined to review the ALJ's findings (Tr. 1 – 4). Judicial Review of the Commissioner's final decisions is authorized by 42 U.S.C. § 405(g).

For the reasons set forth below, it is **RECOMMENDED** that that this case be **REMANDED** to the Commissioner of Social Security, and that the Court adopt the following findings of fact and conclusions of law:

# I. <u>FINDINGS OF FACT</u>

### A. *Procedural History*

On October 12, 2006, Stout filed his applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning May 3, 2006. (Tr. 11). The Applications were denied initially, and again upon reconsideration. Stout timely filed his written request for a hearing on March 6, 2007. Id. On December 6, 2007, Stout appeared and testified at a hearing before ALJ Thomas. Id. On February 12, 2008, the ALJ issued an unfavorable decision finding Stout not disabled. (Tr. 11-18). On or about February 29, 2008, Stout timely filed his Request for Review of Hearing Decision. (Tr. 7). On February 9, 2009, the Appeals Council of the Social Security Administration ("Appeals Council") denied Stout's Request for Review. (Tr. 1-4). The February 12, 2008 decision of the ALJ stands as the final decision of the Commissioner, and Stout has exhausted all administrative remedies.

### B. *Substantive History*

#### 1. <u>Stout's Medical History</u>

In October 2001, Stout injured his back at work when he fell four feet while climbing off a canopy (Tr. 203, 227). On October 8, 2001, Stout received x-rays of his low back and sacroiliac joints at Lourdes Medical Pavillion (Tr. 229 – 230). On October 10, 2001, Stout visited Peter Ward, M.D., at Commonwealth Industrial and Occupational Health, reporting pain in his right hip, thigh and mid-back. (Tr. 224). Stout rated his pain at 7 out of 10, or sometimes 10 with movement. *Id.* Dr. Ward prescribed medication and restricted Stout to lifting 30 pounds with no twisting, bending, pushing or pulling. (Tr. 223). On October 15, 2001, Stout reported continued pain, and Dr. Ward continued his medication. (Tr. 221 – 222). On October 22, 2001, Stout reported pain in the low back and both hips with radiating pain to both legs, left greater

than right. (Tr. 220). Dr. Ward diagnosed low back pain with left radicular symptoms, prescribed physical therapy and limited Stout to lifting 20 pounds, among other restrictions. (Tr. 219).

From October 24, 2001, through December 14, 2001, Stout underwent physical therapy at Massac Memorial Hospital on 20 occasions. (Tr. 240 – 251).  Treatments included moist heat, ultrasound and electrical stimulation. (Tr. 240).  On October 24, 2001, Stout reported that when he walks or stands for very long, his left leg goes completely numb. (Tr. 243).  On October 29, 2001, Stout visited Dr. Ward and complained of continued radicular symptoms. (Tr. 217 – 218). Dr. Ward prescribed additional medications, ordered continued therapy and ordered an MRI. (Tr. 217).  On October 30, 2001, a magnetic resonance image (MRI) scan of the lumbar spine revealed left paracentral disc protrusions at L4-S1 (Tr. 225).  On November 6, 2001, Stout reported continued back pain with radicular symptoms. (Tr. 216).  Dr. Ward diagnosed disc herniation(s) with radicular symptoms, ordered continued therapy and restricted duty and ordered an evaluation by a neurosurgeon. (Tr. 215).  Stout reported continued pain on November 21, 2001, while awaiting the neurosurgical evaluation. (Tr. 214).  Dr. Ward noted unchanged pain on December 7, 2001. (Tr. 212).  On December 14, 2001, therapy records noted little change in Stout's low back and left leg pain, which he rated at 4 out of 10. *Id.*

On December 17, 2001, Stout visited Sean P. McDonald, M.D., regarding his back injury. (Tr. 202 – 204).  Dr. McDonald noted numbness and tingling down to the foot, and noted that symptoms were worse with standing and walking. *Id.*  He noted positive MRI findings and positive findings with straight leg raise. *Id.* Dr. McDonald recommended surgery. (Tr. 203 – 204).

On December 21, 2001, Stout discussed with Dr. Ward the recommendation of Dr. McDonald, and indicated that he wanted a second opinion. (Tr. 209 – 210).  On January 4, 2002,

Dr. Ward noted worsening radicular symptoms and noted that Stout "needs second opinion and surgery ASAP." (Tr. 207).

On January 22, 2002, Stout visited Richard A. Berkman, M.D., regarding his spine and leg symptoms. (Tr. 36 – 38).  Dr. Berkman noted that standing and walking causes increased pain. (Tr. 36).  He stated "certainly his left L5 radiculopathy is quite credible given his weakness in his left ankle anterior tibialis function." (Tr. 37).  Dr. Berkman discussed Stout's options and indicated that surgery was the best option. *Id.*

Four months after his injury in February, 2002, Stout underwent surgery performed by Dr. Berkman, who confirmed a disc rupture. (Tr. 35).  Dr. Berkman prescribed medication and instructed Stout to return in one month. *Id.*  On March 5, 2002, Dr. Berkman ordered physical therapy 3 times per week for 4 weeks, to include bending, stretching and strengthening. (Tr. 237).

On March 20, 2002, the therapist noted that Stout's mid-back pain was worse since surgery, but that pain radiated no further than the hip. (Tr. 236).  Stout reported that his left great toe was constantly numb. *Id.*  Stout reported increased pain with bending, twisting and standing. *Id.*  Stout underwent approximately 11 therapy sessions between March 20, 2002, and April 12, 2002. (Tr. 234).  On April 12, 2002, the therapist noted that Stout's flexion goals were not met, among other issues. (Tr. 234). On April 15, 2002, the therapist noted that Stout's mid-back pain continues, and that he needs to continue to increase strength and flexibility. (Tr. 233).  On April 16, 2002, Dr. Berkman prescribed two weeks of work hardening. (Tr. 34).  From April 17, 2002, through May 2, 2002, Stout underwent work reconditioning on approximately ten occasions at Purchase Physical Therapy. (Tr. 255 – 272).  On April 17, 2002, Stout reported back soreness

and stiffness since surgery, and increased symptoms with driving or prolonged standing more than 10 – 15 minutes. (Tr. 271).

On May 2, 2002, a functional capacity evaluation ("FCE") noted that Stout reported pain of 5 out of 10 before and after testing, and 5 to 6 out of 10 during testing. (Tr. 259). The FCE stated "[h]e exhibited movement patterns consistent with reported pain levels with no evidence of symptom exaggeration," and noted maximum effort. *Id.* The FCE revealed that Stout could perform "heavy work." *Id.*

On May 14, 2002, Dr. Berkman indicated that Stout could work light duty. (Tr. 32). On June 11, 2002, Stout reported leg pain and increased back pain after returning to work. (Tr. 30). Dr. Berkman prescribed medication and continued Stout's light duty status. *Id.* On July 9, 2002, Stout returned to Dr. Berkman. (Tr. 28 – 29). He reported continued back pain, and symptoms at night. (Tr. 28). Dr. Berkman indicated that the low back pain did not improve after surgery. *Id.* He recommended six weeks of medium work. *Id.* Dr. Berkman prescribed medications to help Stout sleep. (Tr. 28 – 29). On August 20, 2002, Dr. Berkman removed Stout from work and ordered six weeks of therapy due to back and hip pain. (Tr. 26). Dr. Berkman stated, "it is possible that even after completing his physical therapy trial that he will need to find different work altogether." *Id.*

In August 2002, Stout visited Purchase Physical Therapy for two additional sessions. (Tr. 252 – 256). Treatment included moist heat and electrical stimulation. (Tr. 252). On August 22, 2002, Stout reported mid and low back pain with right radicular symptoms. (Tr. 255). Stout reported back stiffness and reported that symptoms affect his sleep. *Id.* Stout reported a shooting pain down to his right knee, and reported increased pain with standing, walking and extended sitting. *Id.* Stout underwent physical therapy at HealthSouth on approximately 17 occasions

between October 3, 2002, and November 21, 2002. (Tr. 278 – 321).  On October 3, 2002, Stout reported pain at 4 out of 10 and pain radiating down his right leg. (Tr. 319).  On October 9, 2002, Stout reported stiffness and soreness. (Tr. 315).  On October 30, 2002, the therapist noted limited sitting and standing, and noted that Stout could not work due to his injury. (Tr. 294).   On November 5, 2002, Dr. Berkman noted that Stout made improvement in therapy, and indicated that he would make recommendations after the FCE. (Tr. 23).  On December 12, 2002, an FCE found that Stout's ability to lift floor to knuckle, carry and walk were inadequate for his occupation. (Tr. 273 – 274).  Stout returned to work after this FCE, and there is no evidence in the record to indicate that Stout received medical treatment for his pain until April, 2006. (Tr. 50 – 51).

On April 14, 2006, Stout visited Angela C. Compton, FNP, reporting chronic pain radiating from his neck to his low back. (Tr. 343).  Nurse Compton ordered an MRI and prescribed various medications including Flexeril. *Id.*  On April 24, 2006, a cervical MRI revealed small disc protrusions at C4/5 and C6/7, mild facet arthropathy, and mild foraminal stenosis at C3/4 and C5/6. (Tr. 330).  A thoracic MRI on the same date revealed disc herniations at T4/5, T5/6, T6/7 and T9/10 and arthropathy. (Tr. 332-33).  An MRI of Stout's lumbar spine revealed evidence of the prior surgery, facet hypertrophy, disc bulging and mild-to-moderate foraminal stenosis at L4-S1, but "no evidence of residual or recurrent disc herniation" (Tr. 335, 349).  Nurse Compton noted the MRI results that same date, and referred Stout to a neurosurgeon. (Tr. 342).

On May 22, 2006, Stout visited Andrew F. Walker, M.D., in Cape Girardeau, Missouri. (Tr. 326 – 327).  Stout reported neck pain radiating to the mid-thoracic region for one year. *Id.*

Stout rated his pain at 7 out of 10. (Tr. 326).  Dr. Walker performed an epidural steroid injection at C7-T1. (Tr. 327).

On October 2, 2006, Stout visited S. Kent Griffith, M.D., reporting chronic back and neck problems. (Tr. 341).  Dr. Griffith assessed chronic back pain. *Id.*  During this visit, Stout also requested that "paper work…be filled out regarding his plans to apply for disability" (Tr. 329, 341).  Stout told Dr. Griffith that he had surgery on his back about five years ago, and that the surgery resolved the radiculopathy and numbness in his leg and that he was "doing fairly well now," but had some pain in his neck and upper back. *Id.*  Dr. Griffith noted that Stout had previously undergone MRI studies, but had not seen a surgeon and was not interested in surgery (Tr. 341).  An exam revealed neck and thoracic tenderness, but was otherwise normal (Tr. 329, 341).  Dr. Griffith stated that he would "complete his central labors pension fund form," and told Stout that he should obtain his MRI records "for review by disability panel." *Id.*  Dr. Griffith did not schedule a follow-up appointment. *Id.*

On November 6, 2006, Dr. Bilinsky reviewed the record and opined that Stout could occasionally lift fifty pounds, frequently lift twenty-five pounds, and sit and stand/walk for six hours each in an eight-hour day (Tr. 351).   In addition, he could occasionally climb ladders, ropes and scaffolds, and frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl (Tr. 352).  Dr. Pardo subsequently reviewed the record and agreed with Dr. Bilinsky's opinion (Tr. 376 – 377).

On November 27, 2006, Stout returned to Angela Compton, FNP. (Tr. 375).  Nurse Compton noted that the last time Dr. Griffith saw Stout, Dr. Griffith filled out disability paperwork for him (Tr. 375).  Nurse Compton also noted that the paperwork was sent back to Dr. Griffith with questions "about how many things to do a day.  It got very detailed.  Dr. Griffith

did not want to sign this without sending [Stout] back to rehab, so he did not [sign it]." (Tr. 375). Nurse Compton examined Stout, prescribed medications, and referred Stout to orthopedist Henrik Mike-Mayer, M.D. *Id.*

On December 12, 2006, Stout visited Sherri L. McDonald, MSN, on referral from Dr. Griffith. (Tr. 365 – 366). Stout reported cervical, thoracic and lumbar pain. (Tr. 365). He reported cervical and thoracic pain beginning about one and a half years prior to his visit. *Id.* He described his pain as an achy burning, rated his neck pain a 5 out of 10 and rated his back pain a 7 out of 10. *Id.* On the same date, Stout visited with Dr. Mike-Mayer. (Tr. 367 – 368). Stout complained of lumbosacral pain on forward flexion and extension. (Tr. 367). Dr. Mike-Mayer diagnosed chronic diffuse myofascial pain and noted Stout's prior low back surgery. *Id.* He recommended against surgery, but discussed possible physiatry evaluation. (Tr. 368).

On December 27, 2006, Stout visited Laura E. Holmes, M.D., complaining that he woke up that morning and heard a "pop" in his back, and then had increased back pain for five-to-ten minutes. (Tr. 374). Stout described the pain as more intense than usual and in a lower area than usual. *Id.* Dr. Holmes prescribed Flexeril and Lortab, and referred him for further treatment. *Id.*

On January 5, 2007, Stout visited Nelson Kirk Wong, M.D. (Tr. 404 – 405). Dr. Wong recommended seeing a neurosurgeon or spinal surgeon. (Tr. 405). On January 16, 2007, Stout followed up with Dr. Wong due to back pain. (Tr. 402 – 403). Dr. Wong noted back pain for 5 years and use of Vicodin. (Tr. 402). Dr. Wong also reported that Stout "needs paperwork for disability" (Tr. 402). Dr. Wong prescribed medication and again recommended a neurosurgeon. (Tr. 403). On January 24, 2007, Dr. Wong completed a Physician's Questionnaire regarding Stout's limitations. (Tr. 407 – 408). Dr. Wong noted that Stout required breaks from sitting after 30 minutes, and should not lift over 15 pounds and is not capable of work at any level of

exertion. *Id.*   Dr. Wong related these limitations to Stout's spinal stenosis. (Tr. 407).   On February 1, 2007, Stout returned to Dr. Wong. (Tr. 399 – 401).   Dr. Wong again prescribed medications. (Tr. 400). Dr. Wong referred Stout for pain management. (Tr. 401).   On February 9, 2007, Stout reported that due to the lack of improvement after pain management, he would agree to consider surgery. (Tr. 401).   Dr. Wong referred Stout to a surgeon. *Id.*

On March 30, 2007, Stout visited the Orthopaedic Center of Southern Illinois. (Tr. 386 – 388).   The doctor diagnosed degenerative disc disease and prescribed medication, among other things. Id.   On June 12, 2007, Stout returned to Dr. Wong. (Tr. 397 – 398).   Dr. Wong noted continued chronic back pain. (Tr. 397). Dr. Wong ordered an FCE. (Tr. 398).

On July 2, 2007, Stout underwent an Occupational Therapy Evaluation. (Tr. 379 – 382). The evaluation revealed that Stout could lift up to twenty pounds, push/pull up to thirty-five pounds, stand one-third of a day, walk one-third of a day, and sit one-third of a day (Tr. 380 – 381).   Christine Watt, an Occupational Therapist, stated that Stout's "abilities fall into the 'Light' level according to the Dictionary of Occupational Titles, US Department of Labor.   Clinical findings suggest he will have difficulty with low-level work, repetitive forward reaching, and sustained positioning of more than 30 minutes in sitting or standing." (Tr. 382).   Ms. Watt further stated that "it is unclear if he could realistically participate in competitive employment at this time" due to his difficulty with sitting and standing. *Id.*

On August 1, 2007, Dr. Wong prepared a letter regarding Stout's condition. (Tr. 384). Dr. Wong noted persistent back pain since 2001. *Id.*   He noted that Stout's pain affects his sleep, and that Stout cannot sit or stand for extended periods. *Id.*   Dr. Wong further stated: "It is also believed that due to the level of pain and the scale of his injury of his back, it is unclear whether or not he can participate in any competitive employment or job training for future employment at

this time." *Id.*  On November 16, 2007, Stout followed up with Dr. Wong because he "need[ed] some paperwork for SS disability" (Tr. 390).  Stout rated his back and neck pain as a level 4 (Tr. 390).  An exam revealed diffuse neck and paraspinal tenderness and a decreased range of motion due to pain (Tr. 391).  Dr. Wong stated that he would complete Stout's disability forms, and instructed Stout to return as needed. *Id.*

### 2.  <u>SSA Hearing</u>

#### a.  *<u>Stout's Testimony</u>*

During the December 6, 2007 hearing, Stout testified that he worked as a welder from 1986 to 1995, as a construction laborer from 1996 to 2004, and as a welder from 2005 to 2006. (Tr. 50).  He stated that he underwent low back surgery in 2001. (Tr. 52).  He stated that he currently takes Hydrocodone and Flexeril and that the side effects from these medications include drowsiness and inability to drive for two to three hours after taking them, and that these side effects interfere with his ability to work. (Tr. 52 – 53).  Stout also testified that he continues to have neck and back pain, and that about five days per month, he must lie down almost all day due to back pain. (Tr. 53 – 55).  He testified that he can sit or stand only 20 to 30 minutes before needing to change positions, that he could lift 5 to 10 pounds occasionally, and that he has difficulty tying his shoes due to his spinal condition. (Tr. 55 – 58).  He testified that he no longer sweeps, mops or vacuums, that he never does laundry and that he cannot grocery shop. (Tr. 59).  Stout also stated that he does not do yard work. (Tr. 60).  Finally, Stout said that he was "laid off" in May, 2006 due to "lack of work." (Tr. 51).  After he was laid off, he collected unemployment benefits for six months, and certified that he was able to work through October, 2006. (Tr. 51).

### b. *Vocational Expert's Testimony*

Vocational expert ("VE") Dr. John Grenfell also testified at the hearing. (Tr. 62 – 66).

He testified that, assuming the limitations in the state agency assessment, Stout could perform his

past work as a welder but not his past work as a millwright or a construction laborer. (Tr. 63).

The VE classified Stout's construction laborer job as heavy work and his welder job as medium

work. *Id.* The VE was asked to assume the existence of an individual of Stout's age, who had his

education and past work. *Id.* This individual had the abilities and limitations identified by the

state agency reviewing physician. *Id.* The vocational expert testified that such an individual

could perform Plaintiff's past relevant work as a welder. *Id.* The VE also testified that with

Stout's limitations regarding forward reaching and 30-minute positional limitations on sitting

and standing, he would nonetheless be able to perform certain light unskilled work, which

included copy machine operator, mail clerk or cashier. (Tr. 64 – 65). Dr. Grenfell testified that if

he assumed the limitations described in Stout's testimony that five days per month he could not

get to work, Stout would not be employable. (Tr. 65 – 66).

## II.    CONCLUSIONS OF LAW

### A.  *Legal Background*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within

the meaning of the Social Security Act is limited to a determination of whether those findings are

supported by substantial evidence. *42 U.S.C. § 405(g)* ("The findings of the Commissioner of

Social Security, as to any fact, if supported by substantial evidence, shall be conclusive…."); 

*Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 

1171, 1176 (7th Cir. 2001); See also *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (a 

reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts,

reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1972) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Golembiewski*, 32 F. 3d at 915; *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish a "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *42 U.S.C. § 423(d)(1)(A).*

The Social Security regulations enumerate a five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing a disability. *20 C.F.R. § 416.920.*  The ALJ must first consider whether the claimant is presently employed or "engaged in substantial gainful activity." *20 C.F.R. § 416.920(b).*  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." *20 C.F.R. § 416.920(c).*  If the claimant's impairment is not severe, then the process is over, and the claimant is considered not disabled.  If the finding is severe, however, the ALJ must proceed to step three.

At step three, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. *20 C.F.R. § 416.920(d).* If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *Id.* However, if the impairment does not so limit the claimant's remaining capabilities, in step four, the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of his past work. *20 C.F.R. § 416.920(e).* If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. *20 C.F.R. § 416.920(f).* However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts, at step five, to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. *42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g).* If either Plaintiff is determined not capable to perform other work or such work does not exist in the national economy, the ALJ will enter a finding that Plaintiff is disabled.

The law governing disability determinations provides that ALJs are not required to discuss every piece of evidence; however, they must build a bridge of logic connecting evidence to their conclusion. Regarding credibility assessments, they must articulate the reasons behind their evaluation. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). This standard is not high – only minimal articulation is needed  – enough to allow a reviewer to follow the ALJ's thought process. Once the Court understands the ALJ's reasoning, it can determine whether the rationale has support in the administrative record and meets the applicable legal standard. When the ALJ does not minimally discuss or explain the reasons for rejecting evidence, the Court cannot initiate its review. The first step towards determining whether an adverse credibility

decision is proper and supported is to understand the basis for the assessment; that is, to know why the ALJ discredited the evidence. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

### B. ALJ's Decision

After considering the evidence, the ALJ concluded that Stout was not disabled. (Tr. 11-18).

At step one, the ALJ determined that Stout had not engaged in substantial gainful activity since May 3, 2006, the alleged onset date. (Tr. 13).

At step two, the ALJ found that Stout suffered from severe impairments of status post lumbar laminectomy with back pain. (Tr. 13).

At step three, the ALJ found that Stout did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing. (Tr. 14).

Prior to step four, the ALJ stated that "[Stout] has the [RFC] to perform the full range of medium work.  He can lift and carry 50 pounds occasionally and 25 pounds frequently, and sit for six hours and stand and/or walk for six hours in an eight-hour workday.  [Stout] can only occasionally climb ladders, ropes or scaffolds, but should avoid work at unprotected heights or around moving and dangerous machinery." (Tr. 14).  The ALJ continued, stating that "The undersigned gives little weight to the opinion of Dr. Wong, that…[Stout]…is unable to perform any work, as this finding is on an issue reserved to the Commissioner.  His opinion is unsupported by objective evidence and inconsistent with his own treatment notes.  Pursuant to Social Security Ruling 96-2p, controlling weight may not be given to a treating source's medical opinion unless the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Even if a treating source's medical opinion is well-supported, controlling

14

weight may not be given to the opinion unless it also is consistent with the other substantial evidence in the case record." (Tr. 16 – 17).

With respect to Stout's statements regarding the intensity, persistence and limiting effects of his symptoms, the ALJ determined that these statements were not entirely credible. (Tr. 15). Also prior to step 4, the ALJ found that "Stout has sought very limited treatment for his alleged disabling musculoskeletal impairment.  There is evidence of some tenderness in the lumbar spine; however, there is no evidence of nerve damage or motor and sensory deficits.  Diagnostic findings revealed mostly mild findings. No additional surgery has been recommended, and no treating or examining physician has imposed any limitations on his ability to engage in work related activity." (Tr. 16).

At step four, the ALJ stated that "…the undersigned concludes that based on the persuasive opinion of non-examining state agency physicians, the claimant is capable of performing medum work activity." (Tr. 17).

The ALJ did not proceed to step five, after having found at step four that Stout could perform past relevant work, and denied the benefits sought by Stout in his applications. (Tr. 17 – 18).

### C. Analysis

Stout raises four arguments in this appeal.  The first argument is that the ALJ erred in the weighing of Dr. Wong's medical opinion, and in failing to explain the assertion that Dr. Wong's opinion was inconsistent with treatment records.  The second argument is that the ALJ erred in relying on the opinion of the vocational expert because this testimony was inconsistent regarding the effect of the limitations found during the 2007 Occupational Therapy Evaluation.  The third argument is that the ALJ erred in finding that Stout's claim was unsupported by the objective

evidence, and that the ALJ made erroneous statements regarding the extent of Stout's treatment and limitations.   The fourth argument is that the ALJ erred in finding that Stout's statements regarding his symptoms were not entirely credible.   These arguments will be addressed individually.

### 1.   <u>Weight Afforded to Dr. Wong's Medical Opinion</u>

Stout's first argument is that the ALJ erred in the weighing of Dr. Wong's medical opinion, and in failing to explain the assertion that Dr. Wong's opinion was inconsistent with treatment records.

The ALJ's assessment of a claimant's RFC must be supported by substantial evidence in the record. *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2003), *citing Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); *Griffith v. Callahan*, 138 F.3d 1150, 1152-54 (7th Cir. 1998).   Substantial evidence is evidence sufficient to convince a reasonable person that the ALJ's findings are adequate. *McKinnie*, 368 F.3d at 910, *citing Johansen*, 314 F.3d at 287.   The ALJ need not address every single piece of evidence in his decision, but his analysis must build an accurate and logical bridge between the evidence and his findings. *McKinnie*, 368 F.3d at 910, *citing Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).   Additionally, Social Security Ruling 96-8p requires that "[t]he RFC assessment include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."

20 C.F.R. § 416.927(d) sets forth the factors applied when weighing medical evidence. Under the applicable regulations, an examining expert receives more weight than a non-examining physician. *20 C.F.R. § 416.927(d)(1)*.   Moreover, a treating physician receives more weight than a non-treating physician. *20 C.F.R. § 416.927(d)(2)(i)*.   The length, nature and extent

of the treating relationship constitute additional factors for weighing evidence from a treating physician. *20 C.F.R. § 416.927(d)(2)(i), (ii)*. Other factors considered when weighing medical evidence include the supportability of the opinion by test results, the consistency of the opinion, and the specialization of the physician. *20 C.F.R. § 416.927(d)(3)-(5)*.

Here, the ALJ rejected the opinion of Dr. Wong, and instead adopted the opinion of the state agency physicians. (Tr. 17). The Seventh Circuit has held that inconsistencies between a physician's opinion and his treatment notes are an appropriate reason for rejecting the opinion. *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). The medical evidence record related to Dr. Wong's treatment of Stout is 20 pages long – the majority of which are Dr. Wong's notes from his examinations of Stout. (Tr. 389 – 408). Nonetheless, the ALJ failed to specifically cite to any of Dr. Wong's notes when asserting that that Dr. Wong's "opinion is unsupported by objective evidence and inconsistent with his own treatment notes." (Tr. 16 – 17).

Therefore, the Court is unable to ascertain whether the ALJ's assessment of Stout's RFC was supported by substantial evidence in the record, and should therefore be remanded for further clarification.

## 2. <u>Reliance on the Opinion of the Vocational Expert</u>

Stout next argues that the ALJ erred in relying on the opinion of the vocational expert ("VE") because the VE's testimony was inconsistent regarding the effect of the limitations found during the 2007 Occupational Therapy Evaluation.

During the hearing, the VE pointed out an inconsistency in the 2007 Occupational Evaluation of Stout. Despite the fact that the occupational therapist's ("OT") opinion was that Stout's "abilities fall into the 'Light' level according to the Dictionary of Occupational Titles, US Department of Labor," the OT nonetheless stated that "it is unclear if [Stout] could

17

realistically participate in competitive employment at this time" due to his difficulties in standing and sitting. (Tr. 382).  Thus, despite the assertion that Stout's abilities fall into the light level, the OT nevertheless concluded that Stout may not be able to realistically participate in competitive employment.  The VE was merely pointing out an inconsistency in the OT's assessment, rather than asserting two inconsistent opinions of his own.

Therefore,  there does not appear to be an inconsistency in the VE's testimony, and thus, the ALJ did not err in relying on the VE's statements.

### 3.  The Finding that Stout's Claim was Unsupported by the Objective Evidence

Stout further argues that the ALJ erred in finding that Stout's claim was unsupported by the objective evidence, and that the ALJ made erroneous statements regarding the extent of Stout's treatment and limitations.  Specifically, the ALJ stated that "Mr. Stout has sought very limited treatment for his alleged disabling musculoskeletal impairment. . . . Diagnostic findings revealed mostly mild findings.  No additional surgery has been recommended, and no treating or examining physician has imposed any limitations on his ability to engage in work related activity." (Tr. 16).

As Defendant rightfully points out, Stout only sought treatment for his back pain on six occasions between the date of his filing for disability benefits and the date of his hearing before the ALJ (Tr. 326, 374 – 375, 386, 400, 404 – 405).  His other visits to health professionals during the time period were for the purpose of having paperwork filled out, seeking referrals, and receiving a follow-up on an FCE.  Thus, the ALJ's statement that Stout has sought limited treatment appears to be supported by substantial evidence in the record, given the fact that he only sought treatment six times during 2006 and 2007.

18

The record reveals that Dr. Wong opined that Stout was disabled and could not perform any work. (Tr. 16).  This opinion is inconsistent with the ALJ's assertion that "…no treating or examining physician has imposed any limitations on his ability to engage in work related activity." *Id.*  As discussed above, the ALJ explicitly rejected Dr. Wong's opinion on the grounds that it was "…unsupported by objective evidence and inconsistent with his own treatment notes." (Tr. 16 – 17).  The ALJ, however, failed to specifically cite any of the alleged inconsistencies in Dr. Wong's notes when she rejected his opinion.

Therefore, because the ALJ failed to support her rejection of Dr. Wong's opinion with substantial evidence in the record, and because the rejection of Dr. Wong's opinion led to the assertion that "…no treating or examining physician has imposed any limitations on his ability to engage in work related activity," this case should be remanded for further explanation on the ALJ's rejection of Dr. Wong's opinion.

### 4.  <u>Credibility of Stout's Statements Regarding his Symptoms</u>

Stout's final argument is that the ALJ erred in finding that his statements regarding his symptoms were not entirely credible.  Specifically, Stout argues that the ALJ failed to discuss or analyze the side effects of Stout's medications when making her credibility finding.

With respect to Stout's credibility, the ALJ stated that, "…the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 15).  The ALJ went on to support this assertion with evidence of the relatively small number of visits Stout made to various health professionals for treatment of his alleged pain, the fact that Stout had returned to work after his surgery in 2002,

and the differing opinions of the health professionals who examined or treated Stout between 2002 and 2007.

Nonetheless, 20 C.F.R. § 404.1529(c)(3) states that "factors relevant to your symptoms, such as pain, which we *will* consider include: … (iv) [t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms…" (emphasis added).

Despite the fact that there is no mention of medication side effects in the record other than Stout's assertion of such during the hearing, the regulations state that an ALJ will consider side effects of medication, and therefore, because the ALJ failed to discuss Stout's allegation that his medication caused drowsiness, this case should be remanded for further clarification.

### III.    RECOMMENDATION

For the reasons set forth above, it is **RECOMMENDED** that that this case be **REMANDED** to the Commissioner of Social Security for further clarification with regard to the ALJ's finding of inconsistencies between Dr. Wong's opinion and his treatment notes, and the ALJ's failure to discuss Stout's allegation that his medication caused drowsiness.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1 (b), the parties shall have fourteen (14) days after service of this Report and Recommendation to file written objections thereto. The failure to file a timely objection may result in the waiver of the right to challenge this Report and Recommendation before either the District Court or Court of Appeals. *Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir. 2004); *United States v. Hernandez-Rivas*, 348 F.3d 595, 598 (7th Cir. 2003).

**SO RECOMMENDED.**

**DATED: <u>April 1, 2010.</u>**

<u>**s/ *Philip M. Frazier***</u>
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**